UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO:    25-99 |
| | * | |
| MICHELE HOLIFIELD GIBBS, | * | DIV. |
| AS ADMINISTRATOR o/b/o THE | * | |
| ESTATE OF EDWARD DRANT GIBBS | * | MAG. |
| | * | |
| VERSUS | * | JURY TRIAL DEMANDED |
| | * | |
| CITY OF SARALAND, ALABAMA; | * | |
| CHIEF OF POLICE, JAMES C. WEST *in* | * | |
| *his official and individual capacities*; | * | |
| ADMINISTRATOR/WARDEN DET. | * | |
| BILLY O'DELL *in his official and* | * | |
| *individual capacities*; OFFICER  JAMES | * | |
| BRUCE HARBIN; *in his official and* | * | |
| *individual capacities;* OFFICER KEMYRA | * | |
| PENNINGTON *in her official and* | * | |
| *individual capacities*; OFFICER ASHLYN | * | |
| MICHELLE DANZEY *in her official and* | * | |
| *individual capacities*; | * | |
| AND FICTITIOUS DEFENDANTS 1-5 | * | |
|  (*five unidentified jailers*) *in their* | * | |
| *official and individual capacities* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES

**NOW INTO COURT COMES,** Michelle Holifield Gibbs, the wife of Edward Drant

Gibbs (Deceased), as the Personal Representative of the Estate of Edward Drant Gibbs filed in the

Probate Court of Mobile County, Alabama, Case No. 2023-1536.

(1)

**MADE DEFENDANT HEREIN:**

A. CITY OF SARALAND, ALABAMA (hereinafter "The City"), a municipal corporation

organized and existing under the laws of the State of Alabama, with the ability to sue and

1

be sued. At all times pertinent hereto, the City maintained jurisdiction and control over its Municipal Court, causing the Municipal Court to issue Standing Orders regarding the treatment of the City of Saraland's prisoners. The City is further responsible for providing funding, supervision and resources to the Saraland Police Department and the Saraland Jail (hereinafter "The Jail"), to adequately provide for the basic needs of inmates, including providing access to necessary medical care and prescribed medical treatment, and has ultimate authority to establish, maintain and enforce the policies, customs, training, supervision, and practices of the employees of the Saraland Police Department and Saraland Jail, and to ensure that the Jail is staffed with competent personnel adequately trained and competent to fulfill the City's constitutional obligation to provide inmates with necessary medical care and prescribed medical treatment.  The City's official cost-saving policies, customs and practices to deny inmates access to prescription medications for the treatment and control of serious chronic medical conditions or access to non-emergency medical care were the driving force behind the Jail Staff's intentional, willful and deliberately indifferent conduct towards Mr. Gibbs, by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to the City's intentional infliction of  unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

B.  CHIEF JAMES C. WEST, Chief of Police, Saraland Police Department (hereinafter "Chief West") is a person of age and resident of the State of Alabama, who at all times pertinent hereto was acting under the color of state law and responsible for and had final authority for administration, management, and supervision of the Jail and its employees, including the training and instruction of the Jail's employees, acted as a "final policymaker" for the general operation of the Jail, and had the authority and obligation to ensure that the qualified employees were hired, trained and staffed to provide for the serious medical needs of inmates, and to contract or otherwise coordinate third-party healthcare providers to provide inmates with access to necessary medical care. The City's official cost-saving policies, customs and practices to deny inmates access to prescription medications for the treatment and control of serious chronic medical conditions or access to non-emergency medical care were enacted, implemented, maintained and enforced by Chief West and were the driving force behind the Jail Staff's intentional, willful and deliberately indifferent conduct towards Mr. Gibbs, by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to the Chief West's intentional infliction of  unconstitutionally  cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

C.  WARDEN BILLY O'DELL (hereinafter "Warden O'Dell") a person of age and resident of the State of Alabama, who at all times pertinent hereto was acting under the color of state law, and responsible for the day-to-day administration of the Jail, the implementation

and enforcement of the Jail's policies, procedures, customs and practices, and the training and supervision of Jail Staff. Further, Warden O'Dell was at all times pertinent responsible for ensuring that appropriate medical care was provided to Jail inmates, that Jail Staff did not deny, delay or interfere with inmate's access to necessary medical care or prescribed medical treatment, including prescription medications and prescribed monitoring of inmate's vital signs, and had authority and responsibility to ensure that inmates be provided with access to necessary medical care and received necessary medical furloughs. Warden O'Dell further had the authority and responsibility to ensure that qualified employees were hired, trained and staffed to provide for the serious medical needs of inmates, and to contract or otherwise coordinate third-party healthcare providers to provide inmates with access to necessary medical care. In concert with Chief West, Warden O'Dell enacted, implemented, maintained and enforced the City's official cost-saving policies, customs and practices to deny inmates access to prescription medications for the treatment and control of serious chronic medical conditions or access to non-emergency medical care that were the driving force behind the Jail Staff's intentional, willful and deliberately indifferent conduct in denying  Mr. Gibbs' prescribed hypertension medication and access to necessary medical care to treat his serious medical condition of a hypertensive emergency. Additionally, Warden O'Dell was physically present in the Jail during the four (4) day period of July 15, 2023, to July 19, 2023, when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care, and personally participated in the violation of Mr. Gibbs' constitutional rights in causing his death by denying Mr. Gibbs' prescription hypertension medication for multiple days, refusing to refill his hypertension

4

medication prescription, intentionally denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme  pain and suffering, and ultimately his death; amounting to his intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights. Finally, Warden O'Dell had personal knowledge that Mr. Gibbs was not being provided his prescription hypertension medication, that he was in serious need of medical care, and that his subordinates were ignoring Mr. Gibbs' repeated requests to be taken to the hospital, to be seen by EMS and for a medical furlough and acted with deliberate indifference by failing to intervene.

D.  OFFICER JAMES BRUCE HARBIN (hereinafter "Officer Harbin") a person of age and resident of the State of Alabama, who at all times pertinent hereto was acting under the color of state law, and responsible for the day-to-day implementation and enforcement of the Jail's policies, procedures, customs and practices, and the training and supervision of Jail Staff. Upon information and belief, Officer Harbin served in a supervisory capacity over the other guards, including Fictitious Defendants 1-5, and Officers Pennington and Danzy. Further, Officer Harbin was at all times pertinent responsible for ensuring that appropriate medical care was provided to Jail inmates, that Jail Staff did not deny, delay or interfere with inmate's access to necessary medical care or prescribed medical treatment, including prescription medications and prescribed monitoring of inmate's vital signs, and had authority and responsibility to ensure that inmates be provided with access to necessary medical care and received necessary medical furloughs. In concert with Chief West and Warden O'Dell, Officer Harbin enacted, implemented, maintained and enforced the City's

official cost-saving policies, customs and practices to deny inmates access to prescription medications for the treatment and control of serious chronic medical conditions or access to non-emergency medical care that were the driving force behind the Jail Staff's intentional, willful and deliberately indifferent conduct in denying Mr. Gibbs' prescribed hypertension medication and access to necessary medical care to treat his serious medical condition of a hypertensive emergency. Additionally, Officer Harbin was physically present in the Jail during the four (4) day period of July 15, 2023, to July 19, 2023, when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care, and personally participated in the violation of Mr. Gibbs' constitutional rights and in causing his death by denying Mr. Gibbs' prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, intentionally denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to his intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights. Finally, Officer Harbin had personal knowledge that Mr. Gibbs was not being provided his prescription hypertension medication, that he was in serious need of medical care, and that his subordinates were ignoring Mr. Gibbs' repeated requests to be taken to the hospital, to be seen by EMS and for a medical furlough, and acted with deliberate indifference by failing to intervene.

E.  OFFICER KEMYRA PENNINGTON (hereinafter "Officer Pennington"), a person of age and resident of the State of Alabama, who at all times pertinent hereto was acting under

color of law, and was an employee of the Jail who was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Officer Pennington engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, intentionally denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

F.  OFFICER ASHLYN MICHELLE DANZY (hereinafter "Officer Danzy") a person of age and resident of the State of Alabama, who at all times pertinent hereto acted under the color of state law, was an employee of the Jail and was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Officer Danzy engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her

intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

G. FICTITIOUS DEFENDANT 1, a person of age and resident of the State of Alabama, described by witness statement as an African American Female and who at all times pertinent hereto acted under the color of state law and was a guard employed at the Jail, and who worked day shifts from July 8, 2023 to July 19, 2023, and was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Fictitious Defendant 1 engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

H. FICTITIOUS DEFENDANT 2, a person of age and resident of the State of Alabama, described by witness statement as an African American Female and who at all times pertinent hereto was a guard employed by the Jail, and who worked the day shift from July 8, 2023, to July 19, 2023, and was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Fictitious Defendant 2,

engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

I.  FICTITIOUS DEFENDANT 3, a person of age and resident of the State of Alabama, described by witness statement as an African American Female and who at all times pertinent hereto was a guard employed by the Jail, and who worked the night shift from July 8, 2023, to July 19, 2023, and was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Fictitious Defendant 3 engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

J.  FICTITIOUS DEFENDANT 4, a person of age and resident of the State of Alabama, described by witness statement as an African American Female and who at all times

9

pertinent hereto was a guard employed by the Jail, and who worked the night shift from July 8, 2023, to July 19, 2023, and was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Fictitious Defendant 4, engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his death; amounting to her intentional infliction of unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

K.  FICTITIOUS DEFENDANT 5, a person of age and resident of the State of Alabama, described by witness statement as a White Male and who at all times pertinent hereto acted under the color of state law, was a guard, officer or supervisor at the Jail, was physically present in the Jail during the four (4) day period from July 15, 2023, to July 19, 2023 when Mr. Gibbs was denied his prescribed hypertension medication, suffered increasingly severe symptoms of uncontrolled hypertension, and made repeated requests for medical care. Fictitious Defendant 5 engaged in deliberate indifference towards Mr. Gibbs by denying him his prescription hypertension medication for multiple days, refusing to refill his hypertension medication prescription, denying him access to necessary medical care for his serious medical condition, and denying Mr. Gibbs' requests for a medical furlough, the result of which was to cause Mr. Gibbs extreme pain and suffering, and ultimately his

death; amounting to his intentional infliction of  unconstitutionally cruel and unusual punishment on Mr. Gibbs, in violation of his Eighth Amendment rights.

(2)

## I.    STATEMENT OF JURISDICTION:

A. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Michelle Holifield Gibbs (hereinafter "Widow Gibbs"), in her capacity as Administrator of the Estate of Mr. Gibbs brings this action under 42 U.S.C. § 1983 to remedy violations of her deceased husband's Constitutional Rights.

B. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims of the Estate of Edward Gibbs which arise under the laws of the State of Alabama, because those state law claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

C. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to the claims of the Estate of Edward Gibbs occurred in this judicial district. In addition, on information and belief, all defendants reside in the State of Alabama and at least one defendant resides in this judicial district.

(3)

Pursuant to the Code of Alabama § 11-47-192, a verified claim against the City of Saraland, Alabama has been timely advanced, providing notice of the intent to file suit within the required six month period for state law claims of a) wrongful death of Edward Drant Gibbs, b) conscious pain and suffering, e) physical injury, d)  mental and emotional suffering, e) negligence, f) wantonness and/or g) reckless indifference h) punitive damages.

(4)

This action is brought pursuant to 42 U.S.C. § 1983, for Defendants' deprivations of Edward Drant Gibbs' Eighth Amendment rights, and Alabama's Wrongful Death Statute, Ala. Code § 6-5-410.

## II. SUMMARY OF CLAIMS:

(5)

Edward Drant Gibbs died an unnecessary foreseeable and easily preventable death, while in the custody of the City of Saraland, as an inmate in the Saraland Jail.

(6)

Well prior to Mr. Gibbs' incarceration in the Saraland Jail, *Estelle v. Gamble*, 429 U.S. 97 (1976) clearly established "the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* at 103. Indeed, the Supreme Court expressly warned that, "[i]n the worst cases, such a failure may actually produce physical torture or a lingering death," which is exactly what defendants' deliberately indifferent policies, customs, training and conduct combined to cause to occur here. *Id.*

(7)

For decades prior to Mr. Gibbs' incarceration, the controlling precedent clearly established that denying or delaying medical care, or failing to administer prescribed medical treatment, is a violation of an inmate's Eighth Amendment rights. As the Supreme Court has long unambiguously mandated: "deliberate indifference to the serious medical needs of prisoners constitutes 'unnecessary and wanton infliction of pain'"; and that "[t]his is true whether the indifference is manifested…by prison guards in intentionally denying or delaying access to medical care or

intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). As described below, each Defendant's own deliberate indifference to Mr. Gibbs' serious medical needs was manifested in both manners described by the Court, and directly inflicted his unnecessary pain, suffering, and death.

(8)

While in the custody of the City of Saraland, Mr. Gibbs suffered a preventable fatal intraparenchymal hemorrhage (stroke) as a direct result of being denied his prescribed life-supporting hypertension medication, being refused the EMS attention he requested, being refused his requests for transportation to the hospital, being deprived of the opportunity to request his family to obtain his prescription medication, and being refused the opportunity to procure his own medication or medical treatment by virtue of the City's "furlough policy," while he endured the visibly manifested pain, suffering, fear and incapacity of a hypertensive emergency for at least four (4) days; and, said denials and refusals made by the Jail Staff occurred pursuant to the policies, customs and training instituted, maintained and enforced by the City and the Jail's Supervisory Officials in order to avoid the costs of inmate medical care, in direct contradiction to the constitutional obligations mandated by *Estelle,* and its progeny.

(9)

The interference with, and denials and refusals of, medical care and treatment for Mr. Gibbs' serious medical needs occurred with all Defendants having direct and personal knowledge, first of Mr. Gibbs' need for his prescription medication, and then of his resulting need for immediate medical care, as well as the direct and personal knowledge of the foreseeable outcome of depriving a hypertensive patient of his prescription medication, and the consequentially needed medical care.

(10)

The City of Saraland operates a small jail, overseen and controlled by Chief West and Warden O'Dell, with approximately six cells where inmates are held in direct proximity to Jail Staff. The proximity of the Jail Staff to the inmates in this small jail further allows the Jail Staff to hear inmates calling out to them; for medical assistance, or otherwise. Inmates are easily visible to Staff. The Jail further shares a physical location with the Saraland Fire/EMS department, who provides 24-hour EMS services. The majority of its inmates are confined on short-term (48 hours or less) holds pending transfer or release. A small percentage of inmates, like Mr. Edward Gibbs, are sentenced to longer term confinement.

(11)

The City and its supervisory officials, including defendants Chief West and Warden O'Dell, made the intentional decision to neither employ any medical staff for the Jail, nor contract with any third-party healthcare providers to provide services to inmates. They determined the Jail would not provide health monitoring such as blood pressure monitoring, even when prescribed or otherwise directed by a physician. They also made the expense driven decision not to provide inmates with prescription medication or refills of inmate's prescription medication. They claim they will allow relatives to bring prescription medication for inmates but have no procedure in place to facilitate notifying family that there is a need, nor do they consider the appropriateness, challenges, and potential legality of a family member attempting to obtain prescriptions on behalf of another person, or the fact that an inmate may not have any family. They claim the Jail Staff will call EMS in emergency situations, but in practice, as will be shown, the custom, policy, and procedure of the Jail is to deny and delay doing so in order to avoid the cost of EMS response and any resulting medical care the EMS may deem the inmate requires.

(12)

In lieu of providing medical care, the City and its Supervisory Officials instituted and maintained a constitutionally infirm "furlough policy" wherein Jail inmates in need of medical attention are, at the pleasure of untrained non-medical personnel, sometimes permitted to sign furlough documents releasing them from the Jail, and are given a twelve-hour period to do their best to obtain medical attention or prescriptions for themselves; the costs for which the City will not be responsible. Essentially, Saraland's official answer to *Estelle* and the Eighth Amendment rights of their inmates is to open the door and turn sick people onto the street, if the non-medically trained or qualified Jail Staff elects to even provide that opportunity.

(13)

While the City's furlough policy is itself inadequate to meet the *Estelle* requirements, it is also implemented with clearly deliberate indifference; in that the decision whether or not to grant a furlough is not put before medical or even judicial authorities. Instead that power, in this case over life and death, is, by virtue of a "Standing Order," left in the hands of Jail officials and guards who, without any medical training or supervision, or any judicial oversight, can arbitrarily determine whether or not to afford a seriously ill person, or a person in need of prescribed medication, the opportunity to at least be turned loose to try and fend for themselves. In the case of Mr. Gibbs, the untrained Jail Staff on duty, during all shifts, from July 15 through July 19, 2023, each refused to allow Mr. Gibbs such a furlough; and instead, as his health rapidly and visibly failed, responded to his repeated desperate requests for medical care and his life-sustaining medication with clear deliberate indifference: "*Shut up, Mr. Gibbs.*"

(14)

The acts and omissions detailed herein demonstrate individualized intentional and willful disregard for the long established Eighth Amendment right to be free from deliberate indifference to serious medical needs while confined as an inmate, breach the constitutional and common law duties each Defendant owed to Mr. Gibbs, and entitle Plaintiff to an award under both 42 USC § 1983 and the Alabama Wrongful Death Act, Ala. Code § 6-5-410.

## III.    INTRODUCTION:

(15)

While in the City of Saraland's custody, as an inmate in the Saraland Jail, Mr. Gibbs suffered a fatal intraparenchymal hemorrhage secondary to hypertensive emergency ("stroke") on or about July 19, 2023; after being denied his prescribed hypertension medication, and his repeated pleas for medical care were ignored and ridiculed, for at least four (4) days, while he endured the pain and suffering of increasingly severe stroke like symptoms and transient ischemic attacks ("TIAs"), including extreme headaches, blurred vision, dizziness, confusion, and disorientation, during a prolonged diagnosed hypertensive emergency.

(16)

The Jail only contacted EMS once Mr. Gibbs was found on the floor of his cell, covered in his own urine, and in a coma.

(17)

Beginning on or about July 15, 2023, Mr. Gibbs was denied his prescription hypertension medication, his blood pressure began to rapidly rise, and his physical and mental distress grew markedly and observably more sever during each passing day. By the time Mr. Gibbs was finally transported to the hospital on July 19, 2023, the opportunity for any medical or surgical

intervention had been lost, and he could only be provided palliative care, until life support was withdrawn and he eventually passed away on July 24, 2024, without having ever regained consciousness.

(18)

Mr. Gibbs' fatal hypertensive stroke was the direct result of defendants' combining and concurring deliberate indifference and willful and intentional failure and/or refusal to provide Mr. Gibbs with proper and reasonable medical care; including the failure and/or refusal to provide Mr. Gibbs with his prescription medication necessary to control and treat his serious diagnosed medical condition of severe chronic hypertension, refusal to provide Mr. Gibbs with access to needed medical care when the denial of his hypertension medication resulted in a serious medical hypertensive emergency, refusal to provide Mr. Gibbs with a medical furlough to allow him to obtain necessary medical care for himself, and/or refusal to provide Mr. Gibbs access to requested Emergency Medical Services ("EMS") for evaluation and assessment of his serious medical condition.

(19)

Defendants committed these actions with subjective knowledge of Mr. Gibbs' serious diagnosed medical condition, his need for prescription medication and blood pressure monitoring, his lack of prescribed medication and prescribed blood pressure monitoring, his clearly deteriorating physical and cognitive condition, and with full awareness of the predictable outcome of their denial of care: a fatal stroke.

(20)

The Jail Staff independently connected Mr. Gibbs' lack of blood pressure medication to his exhibited physical and cognitive distress, and ultimately his stroke, informing the responding

Mobile County EMS personnel that Mr. Gibbs had hypertension and had been without his prescription blood pressure medication for at least four (4) days; demonstrating their subjective appreciation and understanding that denying Mr. Gibbs his prescribed hypertension medication placed Mr. Gibbs at serious risk of severe injury and death, and was the cause of the medical emergency Mr. Gibbs had been suffering for days prior to the foreseeable result of his ultimate stroke. Moreover, on the medical furlough the Jail Staff belatedly granted after Mr. Gibbs had already suffered a massive stroke and was in a coma, the Jail Staff identified his medical condition as high blood pressure.

## IV.    FACTS:

(21)

On or about April 12, 2023, Mr. Gibbs, a 62-year-old year old indigent man of limited education, entered Mobile County Metro Jail (hereinafter "*Metro*"), where he spent approximately 90 days prior to his transfer to Saraland Jail.

(22)

Metro utilizes a third-party contractor, *NaphCare LLC,* to provide the facility with sophisticated medical services to meet the needs of detainees and inmates, including in-house physician Dr. Ronald Purdue, nurses, and nurse practitioners, including Tracey Nelson, NP and Chanin Williams, NP, who provided medical evaluations, prescription medications, and other necessary medical care to Mr. Gibbs during his incarceration at Metro. Detailed medical records are created for detainees and inmates, including a medication administration record (MAR). These detailed records were created for Mr. Gibbs. As per Metro's policy and procedure, no inmate is denied medical care. Inmates may visit a physician whenever necessary, and a token co-pay

amount is deducted from their commissary account. For chronic diseases such as hypertension, inmates like Mr. Gibbs are provided with "Chronic Care" at the expense of the facility.

(23)

On or about April 12, 2023, while in Metro's custody, Mr. Gibbs experienced a hypertensive crisis, and was cared for by Dr. Ronald Perdue, who prescribed clonidine in titration. A record was created of this event.

(24)

While in Metro's custody, Dr. Ronald Perdue diagnosed Mr. Gibbs with the serious chronic disease of hypertension, provided Mr. Gibbs with Chronic Care at Metro's expense including but not limited to regular medical assessments and regular blood pressure monitoring; Mr. Gibbs' medical records identified him as having Special Care Needs. Dr. Ronald Purdue's diagnosis of hypertension, along with Mr. Gibbs' prescribed medications, regular assessments, monitoring, identification as having Special Care Needs, and routine Chronic Care were all recorded in Mr. Gibbs' medical records.

(25)

On June 15, 2023, while in Metro's custody, Mr. Gibbs received care from Tracy Nelson, NP, who, acting under the direction of Dr. Ronald Purdue, prescribed Mr. Gibbs Lisinopril Oral 20 mg, once in a.m. 30-day supply.  A record was created of this event, which was included in Mr. Gibbs' medical records.

(26)

Publicly available medical guidance regarding Lisinopril notes that this medication must not be abruptly discontinued, because in addition to causing the patient to have uncontrolled hypertension, abrupt discontinuation of Lisinopril may cause a rebound hypertensive crisis.

(27)

On July 7, 2023, Mr. Gibbs was released from Metro. As per Metro's policies and applicable law, a warrant search was conducted as to Mr. Gibbs, prior to his release, whereupon a warrant originating from Saraland for unpaid fines resulting from a 2015 conviction for the theft of two pieces of meat and a t-shirt from the local Walmart, all together worth $35.16, was discovered. Mr. Gibbs had been sentenced to 30 days in the Saraland Jail in 2015. This sentence was suspended. Mr. Gibbs was placed on probation and ordered to pay $634.00. Mr. Gibbs was unable to make all the required payments, and a warrant was issued for his arrest. This warrant appeared in Metro's search. Metro contacted Saraland, and the Jail agreed to pick up Mr. Gibbs.

(28)

As per Metro's policy and procedure, on July 7, 2023, Metro's clinic nurse was notified that Mr. Gibbs was to be released, and the nurse prepared Mr. Gibbs' Lisinopril Oral 20 mg prescription, which contained a week's worth of medication remaining, along with Mr. Gibbs' MAR and other medical records identifying him as a hypertensive patient who required medical management, including records indicating that Mr. Gibbs had experienced a hypertensive emergency at Metro, that required blood pressure monitoring and treatment with prescription hypertension medication, as addressed above. All medical records, medication, and personal property were gathered in a bag known to Metro and the Jail as the "*Metro Bag*." Saraland Transporting Officer Pecue accepted custody of Mr. Gibbs along with the Metro Bag and signed Metro's "*body book*" acknowledging that he had taken custody of Mr. Gibbs, and his personal and medical property contained in the Metro Bag.

(29)

Officer Pecue transported Mr. Gibbs to the Jail, whereupon Officer Pecue surrendered the Metro Bag with Mr. Gibbs' possessions, including his medical information and property, to Officer Danzy, who signed an Initial Property Inventory Report acknowledging her receipt of the Metro Bag.

(30)

Officer Danzy thereafter noted on Saraland records that Gibbs had "high blood pressure," providing actual knowledge to all defendants that Gibbs suffered from a serious diagnosed chronic medical condition requiring care.

(31)

From the beginning of his confinement in the Jail (Saraland) on July 8, 2023, defendants intentionally interfered with Mr. Gibbs' prescribed treatment by refusing to provide him with the prescribed medical assessment and blood pressure monitoring, or access to healthcare providers qualified to conduct the necessary prescribed assessments and blood pressure monitoring.

(32)

On or about July 8, 2023, the family of Mr. Gibbs attempted to pay outstanding fines and/or bond, so that Mr. Gibbs could be released. The Jail Staff refused their request and would not allow them to see Mr. Gibbs.

(33)

The Jail Staff did not inform Mr. Gibbs' family that Mr. Gibbs would require a medication refill of his prescribed hypertension medication in mere days.

(34)

The Jail Staff did not obtain family contact information which would have allowed a family member to be contacted about Mr. Gibbs' requirement for his prescription blood pressure medication to be refilled.

(35)

On July 10, 2023, Mr. Gibbs appeared in court, at which time his probation was revoked, and he was ordered to spend 30 days in the Saraland Jail (the Jail), with 2 days credit for time served.

(36)

During his incarceration in the Saraland Jail, the Defendants never provided Mr. Gibbs with his prescribed medical assessments and blood pressure monitoring. From on or about July 15, 2023, the Jail Staff further intentionally interfered with Mr. Gibbs' prescribed treatment, by denying Mr. Gibbs his prescription hypertension medication, and further intentionally denied Mr. Gibbs necessary medical care by refusing to obtain a refill for his prescription or provide him with access to a healthcare provider or a medical furlough to allow him to attempt to obtain the medication prescribed to treat his serious diagnosed chronic medical condition, severe hypertension.

(37)

The Jail's denial of Mr. Gibbs' prescribed hypertension medication caused Mr. Gibbs' blood pressure to become dangerously uncontrolled and resulted in him suffering an increasingly severe multi-day hypertensive emergency, manifested by stroke-like and TIA symptoms, including severe headaches, blurred vision, dizziness, physical weakness, confusion, and disorientation.

(38)

During each shift from at least July 16, 2023, until his July 19, 2023 stroke, Mr. Gibbs requested medical furlough, EMS attention, and/or transport to the hospital to obtain medical care and each member of the Jail Staff that was on-duty during those shifts callously ignored the obvious signs of his serious need for medical care and intentionally refused his desperate requests.

(39)

Mr. Gibbs also requested that Jail Staff on-duty on July 17 and July 18, 2023, provide assistance in contacting his family so that they could obtain his prescription medication, but the Jail Staff, knowing that Mr. Gibbs was impaired and displaying a confused state of mind, refused to assist Mr. Gibbs to contact his family or otherwise notify the Gibbs family that Mr. Gibbs needed his medication.

(40)

On or about July 17, 2023, another inmate held for the City of Chickasaw, and the financial responsibility of the City of Chickasaw, became ill. The Jail Staff immediately contacted Chickasaw EMS to provide medical care to this inmate, who was within hearing distance of Mr. Gibbs.

(41)

Mr. Gibbs begged to be seen by this EMS, or provided access to Saraland EMS, who were in the same building as the Jail. The then on-duty Jail Staff instead denied Mr. Gibbs' requests for access to EMS assessment, and told him to "*shut up*."

(42)

Mr. Gibbs' hypertensive and stroke-like symptoms, visible physical distress, and his repeated requests for medical care to both day and night shift Jail Staff were callously ignored and

disregarded by the Jail Staff, whose consistent response was to tell Mr. Gibbs to "*shut up*," and stop complaining, while standing by and watching his medical condition continuously deteriorate to the point Mr. Gibbs suffered a fatal intraparenchymal hemorrhage of the brain stem ("stroke") in the early morning hours of July 19, 2023; without ever even having his blood pressure checked.

(43)

Only after Mr. Gibbs ultimately suffered a non-survivable massive intraparenchymal hemorrhage, secondary to the hypertensive emergency resulting from the denial of his prescribed medication to control his severe hypertension and requests for medical care, and was in a coma, laying in his own urine on his cell floor, did the Jail Staff first contact the EMS – i.e., after it was too late for any medical care to save Mr. Gibbs' life.

(44)

By the time the Jail Staff finally allowed by Mr. Gibbs to be assessed by EMS, his blood pressure was recorded at **<u>224/141</u>**; well above the American Heart Association criteria for a hypertensive crisis.

(45)

EMS and hospital records demonstrate that Jail Staff informed first responders EMS that Mr. Gibbs had hypertension and had not received his hypertension medication for four (4) days, evidencing that the Jail Staff had personal subjective knowledge of Mr. Gibbs' serious medical need, and demonstrating their subjective appreciation and understanding that denying Mr. Gibbs his prescription hypertension medication, or any mechanism by which to refill his necessary prescription, placed Mr. Gibbs at serious risk of injury and death.

(46)

As Mr. Gibbs lay unconscious on the floor, covered in his own urine, Defendant Pennington drew up "furlough" paperwork, releasing the comatose prisoner into his own custody in effort to spare the City the cost of his medical care. Again, demonstrating the Jail Staff's subjective recognition that the denial of Mr. Gibb's prescribed hypertension medication caused his blood pressure to become increasingly more uncontrolled over the four days preceding his stroke, the reason for the belated medical furlough was listed as "high blood pressure."

(47)

Physicians of Mobile Infirmary diagnosed Gibbs with an intraparenchymal hemorrhage secondary to hypertensive emergency, hypertensive emergency, acute hypoxemic respiratory failure, leukocytosis with banemia, and hypokalemia. Gibbs was placed on life support. On July 24, 2023, physicians determined it was too late to provide Gibbs with any meaningful chance of recovery, and withdrew him from life support.

## A) FACTS RELATED TO THE CITY OF SARALAND AND SUPERVISORY OFFICIALS

(48)

The City, Chief West, and Warden O'Dell intentionally adopted, implemented, maintained and enforced cost-avoidance policies, customs and training to delay and deny inmates access to needed medical care and prescribed medical treatment, exclusively so that the City would not incur the cost of inmates' necessary prescription medications and medical treatment and care, and those policies, customs and training directly caused the Jail Staff's deliberate indifference to the serious medical needs of inmates such as Mr. Gibbs, including:

- Determining *not* to hire a jail nurse or otherwise staffing the jail with any employee competent and qualified to assess or evaluate inmates' health conditions or inmates' needs

for medical care, including the necessity of access to care and treatment by a physician or hospital, nor contracting with any third-party medical provider for the incarcerated, such as *NaphCare.*

- Denying inmates with serious diagnosed chronic medical needs that require continuous pharmacological control and treatment, with their prescribed life supporting medications through the omission of any reasonable mechanism by which an inmate may obtain or refill said medication;

- Denying or delaying such inmates' access to necessary medical care from qualified healthcare providers;

- Denying inmates with known life-threatening chronic illnesses, like hypertension, necessary monitoring; and

- Denying inmates medical evaluation for complaints of pain or illness.

(49)

Said policies, customs, and training knowingly operate to deny, delay, and interfere with inmate's necessary medical care and treatment, but are purposefully maintained and enforced by the City, Chief West, and Warden O'Dell in conscious disregard for the health of inmates, solely to avoid the cost of providing inmates with constitutionally required reasonable access to healthcare providers and prescribed medications, treatment and care. See, e.g., *Bozeman v. Franklin,* 2022 U.S. Dist. LEXIS 153887; 2022 WL 3701973 (M.D. Ala 2022); *Harris v. Coweta Cnty.,* 21 F.3d 388, 394 (11th Cir. 1994).

(50)

The Jail has a long history of knowingly denying hypertensive inmates with access to their prescribed blood pressure medication while incarcerated in the Jail, despite the actual knowledge

26

of the City, Chief West, and Warden O'Dell that the denial of such medical care and interference with prescribed medical treatment of chronic conditions and diseases, such as severe hypertension, exposes inmates to the highly foreseeable and predictable consequence of serious injury and/or death; and did so directly result in Mr. Gibbs' death, here.[1]

(51)

It has long been well-established, and was known to the City, Chief West, Warden O'Dell at all times pertinent hereto, that inmates do not have the physical freedom to provide for their own medical needs and are, instead, wholly dependent upon them and their Jail Staff to provide access to necessary healthcare providers, prescription medications, and other required medical treatment and care. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

(52)

The City, Chief West, and Warden O'Dell knowingly and intentionally adopted, implemented, enforced,  and maintained a constitutionally infirm "medical furlough" policy, as an artifice to manufacture the appearance of providing a mechanism for inmates to obtain access to medical care, but that is actually intentionally applied and utilized to deny and delay medical care to inmates to reduce Jail costs.

---

[1] In February 2016, an inmate by the name of Gary P. Greene was incarcerated at the Jail under the custody and control of Chief West. Mr. Greene had in his possession a very low supply of hypertension medication. Several days after his incarceration, Mr. Greene ran out of his prescription hypertension medication. In litigation later filed, Mr. Greene swore that he had informed Jail personnel that he required his hypertension medication, but Jail personnel took no action until he suffered a hypertensive emergency on or about March 6, 2016. At this time, Mr. Greene was taken by EMS to Mobile Infirmary Hospital, where he received appropriate care. Instead, Mr. Greene was only permitted furlough when his medical needs became emergent and life-threatening, at which time, EMS services and a furlough were granted to him so that he could be hospitalized. *See, e.g., Greene v. Richards,* 2017 U.S. Dist. LEXIS 87452 (S.D. Ala. June 5, 2017).

(53)

The City, Chief West, and Warden O'Dell knew that inmates, especially those like Mr. Gibbs that they incarcerated for extended periods of time, would require prescription medications and access to medical care. Instead of hiring or contracting with any qualified healthcare provider to assess inmate's medical needs in the Jail, they intentionally elected to eliminate the cost of providing a case-by-case medical-judicial review of the need for a medical furlough, and instead obtained a "Standing Order" from the City Judge, that gives the Jail Staff exclusive authority to grant or deny an inmate's request for a medical furlough, without providing any Jail personnel with the training, licensure, or qualification required to make a reasonable evaluation and assessment of any inmate's need for a medical furlough, or medical care generally.

(54)

Given the specific duties and authority assigned to the Jail Staff under the City's furlough policy, the need for sufficient staffing and training to allow for competent medical assessments, evaluations and determinations of the need for medical care is so obvious, and the inadequacy so likely to result in the violation of inmates' constitutional rights, that the City, Chief West, and Warden O'Dell clearly acted with deliberate indifference to the highly predictable result of inmates' Eighth Amendment rights being routinely violated by a Jail Staff that did not include anyone with medical training, qualifications or competency. The systemic failures of all members of the Jail Staff to provide Mr. Gibbs with his prescribed hypertension medication or access to necessary medical care, over multiple shifts, during at least a four (4) day period, as his condition continued to visibly decline, and the Jail Staff purposefully ignoring Mr. Gibbs' obviously declining physical condition and repeated pleas for medical care and treatment, demonstrate that the City, Chief West, and Warden O'Dell acted with deliberate indifference in implementing,

maintaining and enforcing their inmate healthcare staffing and training policies, procedures, and customs, that directly caused the denial of Mr. Gibb's Eighth Amendment rights, and ultimately his fatal intraparenchymal hemorrhage.

(55)

The averred policies, customs and training adopted, implemented, maintained and enforced by the City, Chief West, and Warden O'Dell, constitute the official policies of the City, were intentionally and deliberately adopted and enacted to avoid the costs of providing necessary medical care to inmates, and were the moving force that caused the deprivation of Mr. Gibbs' Eighth Amendment rights, and ultimately his death.

### B)  FACTS RELATED TO THE JAIL STAFF:

(56)

Warden O'Dell, Officer Harbin, Officer Pennington, Officer Danzy, and the other members of the Jail Staff, including Fictitious Defendants ("Jail Staff"), each subjectively knew: that Mr. Gibbs was diagnosed with hypertension; was prescribed medication as well as regular health assessment and blood pressure monitoring to treat and control his hypertension; that he was not provided his prescribed hypertension medication for at least four (4) days prior to his death; and, that Mr. Gibbs exhibited increasingly severe adverse effects of uncontrolled hypertension, including stroke-like symptoms, pain, suffering, and medical distress, and was in critical need of immediate emergency medical care, during those four (4) days.

(57)

Each member of the Jail Staff had subjective knowledge that Mr. Gibbs was not receiving his prescribed regular assessments, monitoring, and, at least after July 15, 2023, he was not receiving his prescription hypertension medication.

(58)

Upon Mr. Gibbs' arrival at Saraland Jail on or about July 8, 2023, Officer Danzy received, took custody of, and signed for the *Metro Bag* containing Mr. Gibbs' prescription medication, and pertinently, the MAR and associated medical records created by Metro, which detailed Mr. Gibbs' hypertensive condition, previous hypertensive emergencies, and necessary treatment regime including the requirement to be given Lisinopril 20 mg every day. Officer Danzy recorded Mr. Gibbs' diagnosis of Mr. Gibbs' "high blood pressure" in the Saraland Jail's records, providing further notice to Jail Staff of Mr. Gibbs' serious, diagnosed medical condition.

(59)

On July 15, 2023, the Jail Staff permitted Mr. Gibbs' Lisinopril Oral 20 mg prescription to expire without refill.

(60)

Mr. Gibbs sought his family's assistance in obtaining prescription blood pressure medication and bringing it to the jail for its administration in accordance with medical orders. However, he struggled to use the jail cell's phone. He could not recall telephone numbers, and as his condition worsened, he became confused about using the jail cell's phone. The jail cell's phone and/or the code required to utilize the phone was defective, Mr. Gibbs had no money with which to place a call, and/or Mr. Gibbs had simply become too disoriented to follow calling instructions.

(61)

At all times, the Jail Staff were aware and appreciated that Mr. Gibbs was unable to use the phone properly and had requested their help in contacting his brother or other family members to obtain his medication, but refused to contact his family or assist him to do so.

(62)

Jail Staff, knowing that Mr. Gibbs was seeking family to help him obtain medication, and knowing that Mr. Gibbs was in physical distress, displaying a confused state of mind and that his physical and cognitive impairments made Mr. Gibbs unable to successfully place a call, did not assist Mr. Gibbs to contact his family or otherwise reasonably respond to Mr. Gibbs' repeated requests that the Jail Staff help him obtain his prescribed hypertension medication.

(63)

When family members came to the Jail in an effort to check on Mr. Gibbs' welfare and see if they could pay his fines/bond, Jail Staff denied them the opportunity to speak with Mr. Gibbs, and further, failed to inform his family that he required a refill of his hypertension medication prescription.

(64)

Mr. Gibbs complained to both day and night shifts that he required his medication.

(65)

On July 17 and July 18, 2023, Mr. Gibbs complained to both day and night shift that he was suffering headaches, weakness, upset stomach, and vision problems, all of which are known symptoms of hypertensive emergency.

(66)

Rather than providing Mr. Gibbs with emergency medical services or transportation to the hospital he repeatedly requested, multiple members of the Jail Staff, during multiple shifts, consistently ordered Mr. Gibbs to "*shut up*"; while the other on-duty Jail Staff stood by watching Mr. Gibbs' physical and cognitive decline, and the denial of his repeated pleas for help, and made no effort to intervene to stop the violation of Mr. Gibbs' constitutional right to be free from deliberate indifference to his serious medical needs.

(67)

On or about July 17, 2023, in the evening, an inmate held on behalf of the City of Chickasaw became ill and requested emergency medical services. As per the Jail and the City (Saraland) policy and procedure, Chickasaw EMS was contacted to evaluate the sick inmate, at the expense of the City of Chickasaw. At this time, and upon realizing medical personnel were inside the Jail, Mr. Gibbs requested to be seen and provided medical care by the EMS healthcare providers present in the Jail.

(68)

However, as Mr. Gibbs was a Saraland prisoner, and the financial responsibility of Saraland, Chickasaw EMS was not permitted to evaluate him.

(69)

Mr. Gibbs' request for Saraland EMS (in the same building) was also denied by Jail Staff.

(70)

Mr. Gibbs, suffering and afraid, was tortuously forced to endure hearing medical care provided to another inmate in his direct proximity, while it was denied to him during his rapidly worsening life-threatening medical emergency.

(71)

Each member of the Jail Staff had personal knowledge that Mr. Gibbs had been diagnosed with hypertension and was prescribed, and had been receiving, hypertension medication, and further, each member of the Jail Staff had personal knowledge, on or about July 15, 2023, that Mr. Gibbs required a refill of this life-preserving medication, and that this refill did not occur.

(72)

Each member of the Jail Staff was aware and had personal subjective knowledge that Mr. Gibbs was not being provided with medical assessments and blood pressure monitoring.

(73)

Based on Mr. Gibbs' continuous pleas for medical care, his reported symptoms, each of their personal observation of this impaired physical condition and destressed presentation, Warden O'Dell, Officer Harbin, Officer Pennington, Officer Danzy, and the other members of the Jail Staff, including Fictitious Defendants, were each subjectively aware that Mr. Gibbs' medical condition adversely changed after he was no longer provided his prescribed hypertension medication, and that his reported symptoms became more severe and his physical appearance and presentation consistently declined, during the four (4) days his prescribed medication was denied.

(74)

Each member of the Jail Staff, either their own personal involvement with medication distribution, their personal observations and interactions with Mr. Gibbs, or from Mr. Gibbs' repeated requests for his prescribed hypertension medication, or all of the above, had personal knowledge that Mr. Gibbs was not receiving his prescribed medication on multiple consecutive

days, and that he was exhibiting obvious signs and symptoms of medical distress, and required medical treatment that could only be provided by qualified healthcare providers, at a hospital.

(75)

The denial of Mr. Gibbs' prescribed hypertension medication, and the resulting decline in his physical condition, made Mr. Gibbs' serious medical condition and need to be taken to the hospital for emergency evaluation and treatment obvious to any laymen, including the Jail Staff and other inmates.

(76)

Mr. Gibbs' repeated requests for his prescribed medication and for medical treatment were made to, and known by, all Jail Staff on duty during the four (4) days he was denied his hypertension medication, including Warden O'Dell, Officer Harbin, Officer Pennington, Officer Danzy, and Fictitious Defendants ("Jail Staff"). No one in the small Jail during the days Mr. Gibbs was caused to suffer his ever increasingly more dire hypertensive emergency could have avoided observing his serve distress or hearing his emphatic pleas for help.

(77)

During each shift on July 17, 2023 and July 18, 2023, the Jail Staff responded to Mr. Gibbs' pleas for his medication and medical care by repeatedly telling Mr. Gibbs to "*shut up*" and stop complaining about his physical distress and his dire need for his blood pressure medication, while watching his condition decline to the point his uncontrolled hypertension predictably resulted in a fatal stroke.

(78)

Additionally, the delays caused by the Jail Staff's refusal to contact EMS until Mr. Gibbs was comatose denied Mr. Gibbs access to medications that could have reduced his blood pressure prior to Mr. Gibbs' suffering a fatal intraparenchymal hemorrhage. Timely access to necessary medical care would have allowed healthcare providers to administer IV thrombolytic therapy, including tissue plasminogen activator medication ("tPA"), which can prevent the occurrence of a stroke, or stop an ongoing stroke, after it starts, by breaking up cerebral blood clots.

(79)

If timely administered, tPA is effective in preventing a stroke and/or reducing the severity of a stroke and reversing adverse effects of a stroke. However, tPA may only be administered within the first four and one-half (4.5) hours after the patient first experiences any stroke like symptoms (a/k/a point of "last known well" or "last known normal"). As a direct result of the City's cost saving polices, custom and training, Jail Staff ignored Mr. Gibbs' obvious serious need for immediate medical care until well after the expiration of the 4.5-hour time-window during which tPA could have been administered and thereby denied him access to lifesaving medical care.

(80)

By the time defendants finally allowed Mr. Gibbs to be taken to the hospital, Mr. Gibbs had a "dismal prognosis," the consulting neurologist stated that it was too late for even surgical intervention and that Mr. Gibbs would not survive this event, and only palliative care could be provided.

(81)

EMS and hospital records demonstrate that Jail Staff informed first responders EMS that Mr. Gibbs had hypertension and had not received his hypertension medication for four (4) days, as Jail Staff had personal subjective knowledge of the entire situation, and, with deliberate indifference, and consistent with the policies, procedures, and culture of the Jail and maintained by its Supervisory Officials, chose to do nothing until the predictable outcome of Mr. Gibbs' fatal stroke occurred.

(82)

As Mr. Gibbs, comatose, was removed from the jail cell, Officer Pennington finally granted him his furlough. Officer Pennington memorialized her personal knowledge and appreciation of Mr. Gibbs medical condition on the furlough documents stating the reason for release was "high blood pressure".

## C.  FACTS AS TO ALL DEFENDANTS:

(83)

Had Mr. Gibbs been provided his prescription blood pressure medication after July 15, 2023, it is more likely than not that he would not have suffered a hypertensive emergency and stroke during the early morning hours of July 19, 2023, which led to his lingering death on July 24, 2023.

(84)

Had defendants reasonably responded to Mr. Gibbs' first complaints of the symptoms of a hypertensive emergency, including stroke like systems and his associated requests to be taken to the hospital or be evaluated by EMS, or even within 3-4 hours of those initial onset of those

symptoms, Mr. Gibbs would have been a candidate to receive IV thrombolytic therapy, including tissue plasminogen activator medication ("tPA"), which is clinically effective in preventing a stroke, or even stopping an ongoing stroke, after it starts, by breaking up cerebral blood clots.

(85)

Had defendants not ignored the obvious significant change and decline in Mr. Gibbs' condition and his repeated complaints of increasingly severe symptoms and his urgent requests for medical care and transported Mr. Gibbs to the hospital, or had him evaluated by EMS, at any point prior to his suffering the fatal intraparenchymal hemorrhage, Mr. Gibbs would have had the opportunity to receive lifesaving medical treatments to mitigate the adverse consequences of his hypertensive emergency and prevent the fatal hemorrhage, including IV medications to quickly and significantly reduce his blood pressure, and surgical interventions to reduce the pressure, and resulting damage, from the pressure caused by an intercranial hemorrhage.

(86)

Mr. Gibbs' death was the direct and proximate result of the individual defendants' subjective deliberate indifference to Mr. Gibbs' serious medical needs; in combination with the City's deliberately indifferent policies, customs and training to intentionally deny or delay providing prescription medications and necessary medical care and treatment to Jail inmates to avoid the costs of inmate medical care.

## V.    CAUSES OF ACTION:

### COUNT 1
### 42 U.S.C. § 1983
### CITY OF SARALAND

(87)

Plaintiff adopts and incorporates the factual averments contained in the preceding paragraphs, as if fully set forth herein.

(88)

The City of Saraland, through its own intentional conduct, violated Mr. Gibbs' Eighth Amendment right not to suffer deliberate indifference to his serious medical needs and, thereby, directly caused Mr. Gibbs' death.

(89)

The City's calculated conduct directly and proximately caused the Jail Staff to intentionally deny, delay, and interfere with inmates, including Mr. Gibbs, receiving prescribed medical treatment for serious medical needs, and to intentionally deny and/or delay inmates' access to necessary medical care for serious medical needs.

(90)

For years prior to Mr. Gibbs' incarceration, and at all times pertinent hereto, the City had actual knowledge that inmates with serious medical needs were being denied prescription medications necessary to control, manage and treat serious chronic medical conditions, and that the denial of the medications prescribed for inmates' serious medical conditions posed an imminent risk of serious harm to those inmates and, nevertheless, intentionally disregarded those risks purely to save money, in deliberate indifference the inmates' Eighth Amendment rights to adequate medical care, by implementing policies, customs, and training that caused and/or required Jail personnel to deny inmates prescribed medications, refuse inmates' requests to refill prescribed

medications, and deny inmates access to medical care providers to prescribe and/or refill the prescription medications necessary to control, manage, and treat serious chronic medical conditions; solely so that the City would not have to incur the expense of providing inmate medical care.

(91)

For years prior to Mr. Gibbs' incarceration, and at all times pertinent hereto, the City had actual knowledge that inmates with serious medical needs were being denied access to necessary medical care for the treatment of serious chronic medical conditions, and that the denial of medical care for the treatment of serious medical conditions posed an imminent risk of serious harm to those inmates; and, nevertheless, intentionally disregarded those risks purely to save money, in deliberate indifference to the inmates' Eighth Amendment rights to adequate medical care and treatment.

(92)

For years prior to Mr. Gibbs' incarceration, and at all times pertinent hereto, the City had actual knowledge that inmates with hypertension required blood pressure monitoring; however, the City failed to institute any policy or training for Jail staff to monitor inmate blood pressure, knowing that a failure to do so could deprive an inmate of necessary medical care before a hypertensive emergency, in deliberate indifference to the inmates' Eighth Amendment rights to adequate medical care and treatment.

(93)

Instead of staffing the Jail with personnel trained and qualified to make competent medical assessments and evaluations under the City's furlough policy, or otherwise instituting polices and training requiring that inmates are provided prescribed medical treatment and medications and prompt access to necessary medical care for the treatment of serious medical conditions, the City

did the opposite, and implemented and instituted deliberately indifferent policies, customs, plans, schemes, designs and training to intentionally deny and/or delay providing inmates with access to necessary medical care, to avoid the costs of inmate healthcare.

(94)

With actual knowledge that Jail inmates were wholly dependent on the City and Jail staff to provide prescribed medications to treat and control serious chronic life threatening medical conditions, and access to medical care providers to treat serious medical needs, including severe hypertension, the City intentionally implemented policies, procedures, customs and training that required Jail personnel to deny inmates' prescribed medical treatment and medication, and deny and/or delay inmates access to medical care providers.

(95)

To further save costs, the City deliberately chose not to contract or employ any medical care provider, not even a jail nurse, to access, evaluate or monitor inmates' medical conditions and provide or coordinate necessary inmate healthcare, in the Jail; and, intentionally elected to delay and deny inmates access to any outside medical care provider unless and until their untreated health conditions escalated and manifested into an acute medical emergency.

(96)

The City intentionally implemented and maintained policies, procedures, customs and training that directed the Jail Staff not to provide inmates with necessary medical care for serious medical needs from physicians, hospitals or pharmacists.

(97)

The City's furlough policy was intentionally adopted in conscious disregard of the Eighth Amendment rights of City inmates, as it was created for the express purposes of avoiding an

involuntary public institution's duty to provide inmates with medical care, along with avoiding the cost burden of providing inmates with medical care, with deliberate indifference to the substantial risk of suffering and harm indigent inmates with chronic illnesses will endure when denied prescription medication in this manner.

(98)

The furlough policy is a moving force behind the violation of Mr. Gibbs' Eighth Amendment rights, as the City made the availability of a furlough to obtain medical care at the will of Jail Staff that are untrained and unqualified to make any assessment, and who, the City knew prior to Mr. Gibbs' confinement, effectively treated access to medical care as a privilege to those they favored, rather than an inmate right. Given the specific duties assigned to the Jail Staff, under the City's furlough policy, the need for sufficient training to allow for competent medical assessments, evaluations and determinations of the need for medical care is so obvious, and the inadequacy so likely to result in the violation of inmate's constitutional rights, that the City and its policy makers, including Chief West, and Warden O'Dell, clearly acted with deliberate indifference to the highly predictable result of inmates' Eighth Amendment rights being routinely violated by a Jail Staff that did not include anyone with medical training, qualifications or competency.

(99)

The City intentionally placed the decision to grant or deny an inmate's furlough request in the hands of untrained Jail Staff by virtue of an open "Standing Order," without any medical or judicial oversight, further demonstrating the City's deliberate indifference to the substantial risk of suffering and harm inmates with chronic illnesses will endure when denied prescription medication or medical care as a result of being denied furlough.

(100)

The City's cost saving furlough policy, custom and training not to provide Jail inmates with necessary medical treatment, including prescribed lifesaving medications, and access to

healthcare providers, directly caused Mr. Gibbs to suffer obvious and apparent medical distress, that any layman would have recognized required immediate emergency medical care, including TIAs over a number of days, his objectively serious physical condition and repeated pleas for his medication, and repeated pleas for medical treatment being ignored by Jail staff, which directly resulted in Mr. Gibbs suffering a CVA, a/k/a hypertensive stroke, while in custody on July 19, 2023; which, in turn, caused his lingering death on July 24, 2023, in violation of his clearly established Eighth Amendment rights.

(101)

The City's intentional decision not to implement policies, procedures, customs and training to ensure that inmates, such as Mr. Gibbs, received all necessary prescribed medications to treat and control sever hypertension, and to obtain immediate medical care for hypertensive inmates exhibiting adverse symptoms, caused Mr. Gibbs to be denied access to necessary medical care for a serious medical condition during the time period when he could have received lifesaving treatment; and, that denial and delay in providing access to needed medical care directly resulted in Mr. Gibbs' death.

**COUNT 2**
**42 U.S.C. § 1983**
**CHIEF WEST**

(102)

Plaintiff adopts and incorporates the factual averments contained in the preceding paragraphs, as if fully set forth herein.

(103)

At all times pertinent hereto, and prior to the coma and death of Mr. Gibbs, Chief West was the final policy maker for the Saraland Jail and had personal knowledge that the furlough policy was applied selectively, and that inmates had previously been denied an opportunity to receive furlough to refill medications, leading to medical emergencies.

(104)

Through the above-described events, Chief West had personal knowledge that the City's furlough policy was treated as a privilege by the police department and Jail employees under his direct control, in that inmates were not being released to obtain prescription medication, and that this was causing inmates to be denied medical care, in violation of their Eighth Amendment rights.

(105)

At all times pertinent hereto, the Chief West had actual knowledge of a widespread policy and custom to deny Saraland inmates prescribed hypertension medication to avoid the costs of providing inmate necessary medical care, since at least June of 2017; and yet acted with deliberate indifference to the serious medical needs of inmates, participating in the institution and/or enforcement of said policy and custom.

(106)

Chief West failed to intervene and cause his employees to stop denying inmates medical care through misapplication of the City's furlough policy.

(107)

Chief West, under color of law and acting as final policymaker for the general operation of the Jail, instituted an informal and/or oral policy directing his employees at the Jail to reduce costs for the City by denying indigent Saraland inmates EMS attention until such time as the inmate became critically ill.

(108)

Chief West, under color of law and acting as final policymaker for the general operation of the Jail, instituted and/or maintained and enforced an informal and/or oral policy directing his employees at the Jail to reduce costs for the City by authorizing and directing Jail personnel who

were not medically trained to determine whether or not a Saraland prisoner required medical attention.

(109)

Chief West's actions and omissions were taken with full knowledge that said actions and omissions had caused, in the past and at all times pertinent hereto would cause inmates' clear and well-established constitutional rights to be violated, in that inmates were denied medical care in direct violation of the Eighth Amendment prohibiting cruel and unusual punishment of prisoners.

(110)

Chief West's actions and omissions were taken for the purpose of reducing City and Jail expenditures, with deliberate indifference to the constitutional rights of the inmates in his custody.

(111)

As a direct result of the actions and omissions of Chief West, taken under color of law, with full knowledge and deliberate indifference to the fact that said actions and omissions had led and at all times pertinent would lead to the deprivation of prisoners' rights, causing significant risk of substantial harm to the prisoners directly under his power and control, Mr. Gibbs was denied his constitutional rights. Mr. Gibbs was subject to cruel and unusual punishment by being denied medical care, and was caused extreme pain, suffering, and a severe hypertensive emergency on July 19, 2023, which lead to a lingering death on July 24, 2023, in violation of Mr. Gibbs' Eighth Amendment rights.

**COUNT 3**
**42 U.S.C. § 1983**
**WARDEN O'DELL**

(112)

Plaintiff adopts and incorporates the factual averments contained in the preceding paragraphs, as if fully set forth herein.

(113)

At all times pertinent hereto, Warden O'Dell personally and intentionally maintained, implemented, and enforced jail policies, customs and training, to deny and delay inmates access to necessary medical care and treatment, in order to reduce jail costs.

(114)

At all times pertinent hereto, Warden O'Dell was responsible for training, supervising and directing the subordinate Jail Staff to ensure that inmates received necessary medical care and that Jail Staff did not interfere, deny or delay an inmate's prescribed medical treatment. With full knowledge that the City's furlough policy was arbitrarily applied by unqualified and untrained non-medical Jail personnel, and directly caused prescribed medications and treatment and access to medical care to be denied, delayed and interfered with, Warden O'Dell consciously disregarded the serious risk to inmate health and safety and chose not to staff the Jail with any healthcare provider, and to enforce, maintain and train the Jail's policies and customs to delay and deny prescribed medications and access to needed medical care in order to reduce Jail costs.

(115)

Warden O'Dell intentionally and knowingly elected not to maintain, implement and enforce Jail policies, procedures, customs and training to ensure that: inmates received all prescribed medical care, treatment, and medications to treat, manage and control serious chronic

45

medical conditions, such as sever hypertension; prompt medical care was obtained for inmates exhibiting signs and symptoms of adverse medical events and conditions; medical furloughs were promptly granted to all inmates in need of prescribed medications; inmates family members were contacted to bring inmates prescribed medications; subordinate Jail Staff did not interfere with inmates' prescribed medical treatment; or, inmates were not denied access to necessary medical care.

(116)

As a result of Warden O'Dell's decision to maintain and enforce the constitutionally infirm furlough policy and its misapplication of not having proper medical-judicial determinations made when inmates request furlough, the Jail Staff interfered with and denied Mr. Gibbs the prescribed treatment and care for his severe chronic hypertension, and delayed and denied his Mr. Gibbs' serious need for access to medical care. Although Mr. Gibbs' constant complaints of symptoms indicative of a hypertensive crisis, as well as Mr. Gibbs' pleas for medical care were well known to Warden O'Dell, and although stroke, heart attack, and death are well known outcomes of untreated hypertensive crisis, Warden O'Dell elected, with deliberate indifference, to deny Mr. Gibbs the necessary furlough to obtain prescription medication and any other required medical interventions.

(117)

At all times pertinent hereto, Warden O'Dell had actual knowledge of a widespread policy and custom to deny Saraland inmates prescribed hypertension medication to avoid the costs of providing inmate necessary medical care, since at least June of 2017; and have acted with deliberate indifference to the serious medical needs of inmates, participated in the institution

and/or enforcement of said policy and custom, by denying Mr. Gibbs access to his prescription hypertension medication, and denying Mr. Gibbs a refill of this necessary medication.

(118)

As a direct result of Warden O'Dell's callous, deliberately indifferent refusal to authorize medical furlough for Mr. Gibbs on July 15 through July 19, 2023, undertaken with full knowledge of Mr. Gibbs' serious medical needs, Mr. Gibbs experienced hypertensive crisis resulting in coma on July 19, 2023, through his lingering death on July 24, 2023, in violation of his Eighth Amendment rights.

**COUNT 4**
**42 U.S.C. § 1983**
**JAIL STAFF**
**(WARDEN O'DELL, OFFICER HARBIN, OFFICER DANZY,**
**OFFICER PENNINGTON, & FICTITIOUS DEFENDANTS)**

(119)

Plaintiff adopts and incorporates the factual averments contained in the preceding paragraphs, as if fully set forth herein.

(120)

Based upon their own personal observations, interactions, knowledge and information, Warden O'Dell, Officer Harbin, Officer Pennington, Officer Danzy, and the other members of the Jail Staff, including Fictitious Defendants ("Jail Staff"), were each fully aware and had personal, subjective knowledge of Mr. Gibbs' physician-diagnosed severe chronic illness and his prescribed treatment regime, as well as knowledge of the risks and consequences for failing to adhere to his regime and provide him with his medication, as evidenced fully by the medical records of the Mobile EMS and Mobile Infirmary, which establish that Jail Staff reported to EMS that Mr. Gibbs, now comatose, had hypertension and had been without his hypertension medication for four (4)

days, as well as identifying "high blood pressure" as the reason for the belated medical furlough the Jail Staff attempted to provide after Mr. Gibbs had already suffered a stroke.

(121)

Put simply, every member of the Jail Staff knew that Mr. Gibbs was not receiving his prescribed hypertension medication for multiple consecutive days, and Mr. Gibbs' serious need to be taken to the hospital for immediate medical care was obvious and apparent to anyone that was in the Jail, at least from July 17, 2023 to his July 19, 2023 stroke;  including all members of the Jail Staff and other inmates, based upon Mr. Gibbs' severely impaired physical condition and cognitive function, his reported signs and symptoms of a hypertensive emergency, and his repeated pleas for help, begging for first his hypertension medication and then access to medical care. Indeed, the Jail Staff became so frustrated by Mr. Gibbs' dire requests for medical assistance that the Jail Staff repeatedly ordered him to "shut up," on multiple occasions, during multiple shifts, on multiple days.

(122)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, chose to interfere with Mr. Gibbs' physician-prescribed treatment regime for his diagnosed hypertension by refusing to provide, and/or denying access to, the prescribed medical assessments and blood pressure monitoring.

(123)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, chose to interfere with Mr. Gibbs' physician-prescribed treatment regime for

his diagnosed hypertension by refusing to provide, and/or denying access to, Mr. Gibbs' prescribed Lisinopril hypertension medication, and the necessary refill of same.

(124)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, and against the City's own stated policy, chose not to inform Mr. Gibbs' family that Mr. Gibbs would require a refill of his Lisinopril when they came to pay Mr. Gibbs' fines and/or perform a welfare check on him at the Jail.

(125)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, and against the City's own stated policy, refused to assist Mr. Gibbs in contacting his family by phone so that they could bring him his prescribed, medically necessary Lisinopril, even though he had requested that they help him.

(126)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, and while witnessing Mr. Gibbs' obvious physical decline and increasing mental confusion and cognitive impairment, denied Mr. Gibbs' multiple requests for a medical furlough.

(127)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, against the City's stated policy and procedure, and while witnessing Mr. Gibbs' obvious physical decline and increasing mental confusion and cognitive impairment, denied Mr. Gibbs' multiple requests for EMS assistance, telling Mr. Gibbs to "*shut up*."

(128)

The Jail Staff deliberately, and with subjective knowledge of and indifference to the severe risks to Mr. Gibbs, while witnessing Mr. Gibbs' obvious physical decline and increasing mental confusion, and with absolute wanton cruelty, forced Mr. Gibbs to witness another inmate, who was not the financial burden of Saraland, receive EMS care, even as Mr. Gibbs himself experienced obvious painful and frightening symptoms of an ongoing potentially fatal hypertensive crisis and transient ischemic attacks ("TIAs"), even as Mr. Gibbs begged for help.

(129)

As a direct result of the deliberate indifference of the Jail Staff, Mr. Gibbs' prescribed medical care and treatment was interfered with and denied from July 8, 2023, when he was deprived of his necessary prescribed medical evaluations, assessments and blood pressure monitoring.

(130)

As a direct result of the deliberate indifference of each member of the Jail Staff, Mr. Gibbs' prescribed medical care and treatment was interfered with and denied from at least July 15, 2023, when he was deprived of his necessary prescribed blood pressure medication, causing a foreseeable hypertensive crisis.

(131)

As a direct result of the deliberate indifference of the Jail Staff, Mr. Gibbs was denied medical care from July 15, 2023 through July 19, 2023, when his repeated requests for EMS care, transportation to the hospital, or a medical furlough to treat the hypertensive crisis which was caused by the Jail Staff's refusal to provide Mr. Gibbs with his prescription blood pressure

medication, were denied, resulting in the foreseeable outcome of Mr. Gibbs experiencing a stroke on July 19, 2023.

(132)

As the direct result of the Jail Staff's deliberate indifference to Mr. Gibbs' serious medical needs, Mr. Gibbs suffered a severe stroke on July 19, 2023, that was untreatable by the time Mr. Gibbs was finally provided access to medical care, and which resulted in Mr. Gibbs avoidable death on July 24, 2023.

(133)

The individual conduct of each member of the Jail Staff, as described herein, violated clearly established constitutional law by intentionally interfering with Mr. Gibbs' prescribed medical treatment and/or intentionally denying and delaying his access to necessary medical care.

(134)

As a direct result of the Jail Staff's interference with Mr. Gibbs prescribed medical treatment and the denial and delay of access to medical care, Mr. Gibbs was caused unnecessary pain, suffering, and a preventable lingering death on July 24, 2023, all of which was in violation of his clearly established Eighth Amendment rights.

(135)

The Jail Staff, including Warden O'Dell, Officers Harbin, Danzy, Pennington and Fictious Defendants, at all times pertinent acted under the color of law, and each of their own personal acts and omissions, as described herein, violated Mr. Gibbs' clearly established Eighth Amendment right to be free from deliberate indifference to his serious medical needs by intentionally interfering

with Mr. Gibbs' prescribed medical treatment and intentionally denying and delaying his access to medical care, and directly inflicted unnecessary pain, suffering and death to Mr. Gibbs.[1]

**COUNT 5**
**WRONGFUL DEATH**
**ALL DEFENDANTS**

(136)

Plaintiff adopts and incorporates the factual averments contained in the preceding paragraphs, as if fully set forth herein.

(137)

Had Mr. Gibbs survived this catastrophic event caused by all Defendants, he would have cause and right to pursue an action against all Defendants for same.

(138)

Pursuant to Ala. Code § 6-5-410, Michelle Holifield Gibbs, as the personal representative of the Estate of Edward Drant Gibbs, may and does advance this claim for the wrongful acts, omissions, and/or negligence causing Mr. Gibb's death against all Defendants herein.

(139)

The acts and omissions of Defendants described herein, including Fictitious Defendants, violated each Defendant's constitutional and common law duties owed to Mr. Gibbs as an inmate in the City of Saraland Jail and combined and concurred to directly cause Mr. Gibbs' death.

---

[1] Despite pre-filing requests for Jail document and information, Plaintiff has not been provided with all requested records necessary to identify the fictitiously identified defendant Jail guards, but will promptly amend the complaint to do so, upon receiving that information that is exclusively in the Defendants' possession and control.

(140)

Each Defendant's own wrongful, intentional, willful, wanton, and negligent acts, omissions, and conduct interfered with the prescribed treatment of Mr. Gibbs' diagnosed severe chronic hypertension and denied and delayed Mr. Gibbs' access to necessary lifesaving medical care, and was therefore a direct and proximate cause of Mr. Gibbs' death.

(141)

In addition to the direct liability of the City of Saraland, based upon its own acts and omissions, the City of Saraland is also vicariously liable for the wrongful acts and omissions of its officials, officers, agents, and employees that contributed to cause Mr. Gibbs' death.

(142)

Plaintiff, therefore, demands an award of all recovery, including punitive and exemplary damages, available under the Alabama Wrongful Death Act., Ala. Code § 6-5-410, against all Defendants jointly and severally, in the amount a struck jury determines sufficient and appropriate to punish Defendants' egregious conduct and wrongful acts and omissions, and to deter Defendants and other individuals and entities from committing similar culpable conduct.

## VI.    <u>RELIEF SOUGHT:</u>

On the basis shown, Plaintiff Michelle Holifield Gibbs, the wife of Edward Drant Gibbs as the Personal Representative of the Estate of Edward Drant Gibbs prays that this Honorable Court grant and enter the following relief on all counts:

(A)    That Plaintiff be awarded all such compensatory damages including pre-death pain and suffering, pre-death mental and emotional distress, as a jury shall determine appropriate from the evidence presented, against all Defendants jointly and severally, pursuant to 42 U.S.C. § 1983;

(B)    That Plaintiff be awarded against the individual defendants, jointly and severally, all such punitive and exemplary damages as a jury shall determine appropriate from the evidence presented, pursuant to 42 U.S.C. § 1983;

(C)    That Plaintiff be awarded all damages and penalties available under the Alabama Wrongful Death Act, Ala. Code § 6-5-410, against all Defendants jointly and severally;

(D)    That Plaintiff be awarded all recoverable costs and disbursements of this action, together with Plaintiff's attorney fees, expert witness fees, expenses, and prejudgment and post judgment interest, pursuant to 42 U.S.C. § 1988, or otherwise available under any other cause of action; and,

(E)    That Plaintiff be awarded for all general and equitable relief and such other additional relief as the Court determines Plaintiff is justly entitled.

## **JURY DEMAND**

Plaintiff demands a trial by struck jury.

Respectfully Submitted,

*s/T. Kelly May*_____
T. Kelly May (MAY014)
H. Cannon Lawley (LAW029)
C. Andrew Harrell, Jr (HAR241)
Clark, May, Price, Lawley, Duncan & Paul, LLC
3070 Green Valley Road
Birmingham, AL 35243
205-265-6601
205-573-0235 (fax)
kmay@clarkmayprice.com
cannon@clarkmayprice.com
aharrell@clarkmayprice.com